UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSEPH LONGO, JUSTIN LONGO, LOIS
SPATZ, EAVEN SPATZ, RAINA
POMEROY, and MAXWELL NASSAR
individually and on behalf of all others
similarly situated,

      Plaintiffs,

v.

CAMPUS ADVANTAGE, INC.

      Defendant.

_____/

CASE NO.: 8:20-cv-01363

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

1. Defendant, Campus Advantage, Inc., is one of the largest property managers for private dormitory housing near college campuses in our country, including the University of Central Florida ("UCF"). The Plaintiff students — Justin Longo, Eaven Spatz, and Maxwell Nassar — are enrolled at UCF and reside in the Defendant's dormitories. The core offering of these dorms is the college dormitory life: closely-packed shared living quarters, on-site group study lounge, "organized resident activities through our Students First Residence Life program," free printing, shuttle services to the campus, swimming pools, game rooms, fitness centers and "sophisticated roommate matching program."

2. As a result of the COVID-19 pandemic, universities throughout Florida and the nation have ordered that the university campuses be vacated to preserve the safety of the students and the public.  The university-run facilities that students have been asked to evacuate include dormitories similar in physical layout to the facilities operated by the Defendant, which were recognized as unsafe due to the elevated risk of disease transmission inherent to high-density

housing with extensive shared common areas.  Furthermore, these universities, recognizing that it would be inequitable and improper to charge students for housing that became unsafe to occupy, have been refunding housing money to students and their families.

3.   In contrast to the responsible actions of the universities, the Defendant, who touts itself as "student housing management experts," is retaining all funds that their tenants have paid — and continues to demand payment from those who pay month-to-month — for room, board, and other services and amenities, even though the Defendant cannot safely provide them and the students have moved out.

4.   Plaintiffs bring this action on their own behalves and on behalf of a class of persons who executed Housing Contracts with the Defendant but are not receiving the bargained-for services.

**<u>PARTIES</u>**

5.   Plaintiff Joseph Longo is a citizen of Florida, residing in Tampa.  Mr. Longo is a current guarantor and co-signer for his son, Justin Longo's, room at the Defendant's "Northgate Lakes" dormitory for the Fall 2019-Spring 2020 academic school year.

6.   Plaintiff Lois Spatz is a citizen of Florida, residing in Wellington.  Mrs. Spatz is a current guarantor and co-signer for her son, Eaven Spatz's, room at the Defendant's "The Verge" dormitory for the Fall 2019-Spring 2020 academic school year.

7.   Plaintiff Raina Pomeroy is a citizen of Florida, residing in Wellington.  Mrs. Pomeroy is a current guarantor and co-signer for her son, Max Nassar's, room at The Verge for the Fall 2019-Spring 2020 academic school year.

8. Defendant is a Texas corporation headquartered in Austin. It states in its advertising that it "manages thousands of beds at properties across the United States… with over $1.3 billion in assets." It operates at least seven "off-campus student housing" locations in Florida.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Class are in excess of $5,000,000, exclusive of interest and costs, and most members of the proposed Class are citizens of the state of Florida.

10. This Court has general jurisdiction over Defendant, which conducts substantial business within Florida, and thus has significant, continuous, and pervasive contacts with the State.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because the challenged fee practices have been committed in this District, and because Plaintiff suffered the alleged harm in this District.

## FACTS

**A. Defendant advertises and sells "dormitory living" to college students**.

12. Student housing is in high demand at University of Central Florida and nearby colleges. Students may choose to live in college-owned dormitories or private off-campus apartments. Northgate Lakes and The Verge, both managed by Defendant, offer a third option — "luxury student apartments" from a "world-class student housing company."

13. Defendant advertises its dormitories to its target demographic — college students — and touts amenities specifically geared to them, such as roommate matching services, computer labs, free printing, game rooms, recreational activities, socials, shuttle services to the campus, and university involvement.

### B.  Allegations Regarding the Longo Plaintiffs

14. Plaintiff Joseph Longo's son, Plaintiff Justin Longo, is a student at the University of Central Florida. Justin evaluated the available housing options, and selected NorthGate Lakes based largely on its dormitory amenities, including the offering of activities in the dorm's common areas; swimming pools and close proximity to UCF campus

15. Plaintiff Joseph Longo executed a Guaranty Agreement with Defendant on April 2019. The Guaranty Agreement was incorporated within Justin's Lease Agreement for a bedroom and the use of the common areas of a four-bedroom two-bathroom unit at Northgate Lakes for the Fall 2019 and Spring 2020.  Justin moved into the apartment in August 2019.

16. In December 2018, Plaintiffs paid a $99 application fee.  Beginning in August 2019, Plaintiffs paid a monthly room and board cost of $735. To date, Plaintiffs have paid $5,244.

17. Since the COVID-19 pandemic hit and students were forced to evacuate the premises, Plaintiffs did not pay rent for the months of April through June.

18. Defendant is haranguing and harassing Plaintiff and his son concerning a debt that they do not owe.

19. Defendant is attempting to collect rent for the months of April, May and June although Plaintiffs do not owe this debt.

20. Defendant is also improperly retaining a portion of March's rental payment

### C.  Allegations Regarding the Spatz Plaintiffs

21. Plaintiff Spatz's son, Plaintiff Eaven Spatz, is a student at the University of Central Florida evaluated the available housing options and selected The Verge based largely on its dormitory amenities, including university shuttle, activities in the dorm's common areas; and study spaces for the students, including a computer lab.

22. Plaintiff Lois Spatz executed a Guaranty Agreement with Defendant on November 6, 2018. The Guaranty Agreement was incorporated within Plaintiff Eaven Longo's Lease Agreement for a bedroom and the use of the common areas of a three-bedroom, three-bathroom unit at The Verge for the Fall 2019 and Spring 2020. Eaven moved into the apartment in August 2019.

23. In November 2018, Plaintiffs paid a $99 application fee. Beginning in August 2019, Plaintiffs paid a monthly room and board cost of $769. To date, Plaintiffs have paid $6,251, *including* rent for the month of March.

24. Since the COVID-19 pandemic hit and students were forced to evacuate the premises in March-- April, May and June's rent was not paid.

25. Defendant is haranguing and harassing Plaintiffs through multiple phone calls concerning a debt that they do not owe.

26. Defendant harassed and bullied Plaintiffs into paying a debt they did not owe – namely, April, May and June's rent.

27. Defendant is attempting to collect rent for the months of April, May and June although Plaintiffs do not owe this debt and Eaven had already turned in his keys.

28. Defendant also refuses to return monies paid for part of the month of March, even though it could not provide the services under the Lease Agreement.

### D. Allegations Regarding Plaintiff Pomeroy and Plaintiff Nassar

29. Plaintiff Raina Pomeroy's son, Plaintiff Max Nassar, is a student at the University of Central Florida who evaluated the available housing options and selected The Verge based largely on its dormitory amenities, including a shuttle service to campus, the 24-hour gym, pools; and study spaces for the students, including a computer lab.

30. Plaintiff Raina Pomeroy executed a Guaranty Agreement with Defendant incorporated within Plaintiff Max Nassar's Lease Agreement for a bedroom and the use of the common areas of a three-bedroom, three-bathroom unit at The Verge for the Fall 2019 and Spring 2020.  Max moved into the apartment in August 2019.

31. In November 2018, Plaintiffs paid a $99 application fee.  Beginning in August 2019, Plaintiffs paid a monthly room and board cost of $769. To date, Plaintiffs have paid $7,789, including rent for March, April and June, using money saved from summer employment.

32. Defendant is haranguing and harassing Plaintiff Pomeroy and Plaintiff Nassar, through debt collection calls and emails, concerning a debt that they do not owe.

33. Defendant also refuses to return monies paid for part of March, as well as April, May and June's rent, although Defendant collected this money for services it could not provide.

**E. University Campuses Shut Down in Response to the COVID-19 Pandemic, and Defendant Cannot Provide the Bargained-For Services, but Continues to Demand Full Rent**.

34. On March 9, 2020, Florida Governor Ron DeSantis issued Executive Order 20-52 declaring a state of emergency for the entire state of Florida a result of COVID-19.

35. On March 13, 2020, President Donald Trump issued a Proclamation Declaring a National Emergency based upon the COVID-19 outbreak.

36. On March 16, 2020, President Trump and the Center for Disease Control and Prevention ("CDC") issued the "15 days to slow the spread" guidance to slow the spread of the virus, advising individuals of social distancing measures such as avoiding gatherings of more than 10 people, and recommending restrictions for establishments tending to attract mass gatherings and congregations.

37. On March 17, 2020, the University of Central Florida announced that all classes would transition to remote learning through the end of the Spring 2020 semester, canceling all on-campus events due to the COVID-19 pandemic.

38. Students who lived in on-campus housing were told they had to move out or were strongly encouraged to do so, such that they had no meaningful choice but to comply.

39. Further, because all classes were moved online, there was no reason for students to remain near campus if they had other housing available to them.  This is particularly so in the face of the dangers, risks, and fear associated with the pandemic. These risks continue and are expected to continue through the fall semester; "the idea of having treatments available or a vaccine to facilitate the re-entry of students into the fall term would be something that would be a bit of a bridge too far." Dr. Anthony Fauci, Senate Health Committee, May 12, 2020.

40. Most students left campus to be with their families and avoid exposure to COVID-19, and they have stayed off campus to comply with directives from the schools, as well as local, state and federal governments.

41. Recognizing that the on-campus dormitory rooms, meal plans, and services could not be safely used by the students, the universities have agreed to return a fair portion of the students' room and board.

42. Not the defendant. Despite the fact that the dormitories cannot safely be occupied by the students, and the fact that the bargained-for amenities could not safely be provided, the Defendant has refused to return any portion of the room, board, and other fees it has collected.

43. On March 19, 2020 the University of Central Florida announced a student had tested positive for COVID-19.

44. On March 24, 2020, Governor DeSantis issued Executive Order 20-83, directing the State Surgeon General and State Health Officer to issue a public health advisory urging the public to avoid all social or recreational gatherings of 10 or more people, stating "it is necessary and appropriate to take action to ensure that the spread of COVID-19 is slowed, and that residents and visitors in Florida remain safe and secure."

45. On March 29, 2020, President Trump extended the guidelines to be in effect until April 30, 2020.

46. On March 31, 2020, the President updated the guidelines renaming it "30 Days to Slow the Spread" and along with the Coronavirus Task Force urged Americans to adhere to the guidelines.

47. On April 3, 2020, following the Board of Trustees' approval on March 27, 2020, the University of Central Florida began "issuing housing refunds for a portion of the spring semester's rent to residents that were not able to return to campus or have left their rooms, at the direction of the university in response to COVID-19."[1]

48. Furthermore, UCF has urged companies like the Defendant to do the same.  (See **Exhibit A**).

49. The Longo Plaintiffs advised the Defendant that Justin had moved out to comply with social distancing guidelines and school recommendations, and that they had lost employment as a result of the pandemic. Nonetheless, on April 7, 2020, the Defendant told the Longo Plaintiffs that "many people are in the same position," and the Defendant would continue to collect rent from their residents "to pay bills for the property;" and true to their word, they continued debt collection efforts.  (See **Composite Exhibit B**)

---

[1] University of Central Florida, UCF Housing Bings Issuing Refunds, https://www.ucf.edu/coronavirus/ucf-housing-begins-issuing-refunds/ (last visited, April 27, 2020)

50. On April 13, 2020, Plaintiff Lois Spatz informed Defendant that her son Eaven had moved out of the apartment, in compliance with social distancing guidelines and recommendations of the school, and that he turned in his keys and signed a move out form.  Because they were out of work due to the pandemic, and had vacated the premises, they requested to be released from the lease or, in the alternative, to apply lease credits to a future lease.

51. Defendant refused these requests, and on April 27, 2020 invited Plaintiffs to contact an attorney "if [they] felt it was necessary."

52. Plaintiff Lois Spatz told Defendant that when she returned to the room to remove her son's belongings, the room was infested with insects, suggesting the complex was not being properly cleaned and maintained during the pandemic, as outlined in the Lease Agreement.[2]

53. Despite actual knowledge of these facts, Defendant placed multiple debt collection calls to Eaven Spatz's cellular telephone.

54. On May 15, 2020, Defendant made a harassing phone call to Plaintiff Nassar in an attempt to collect May's rent, even though he turned in his keys in March.

55. On June 5, 2020, Defendant sent a debt collection email demanding Plaintiff Nassar pay rent. Almost immediately after receiving the email, Defendant called Plaintiff Nassar and threatened to charge a late fee if he did not pay in full. (See **Exhibit C**)

56. Defendant's demands for payment and refusal to provide partial refunds defies equity, common sense and is in diametrical opposition to the Governor and President's directives concerning the dangers of staying in their facilities.

57. The purpose of the parties' Housing Contract was to provide housing and services including dorm activities, and access to the dorm's common areas and computer lab.

---

[2] "Landlord agrees to furnish electricity (allotment), gas, water, sewer, pest control, trash removal and a cable TV/Internet package for the unit." Supplementary Lease Agreement, ¶2 Utilities and Services.

58. As the Defendant's promotional materials stated, the amenities included on-site group study lounge, "organized resident activities through our Students First Residence Life program," free printing, shuttle services to the campus, swimming pools, game rooms, fitness centers and "sophisticated roommate matching program."

59. These advertised amenities were also referenced in each Lease Agreement, which gave each Plaintiff "the nonexclusive right to use the shared living areas," (Lease Agreement, ¶1 Premises), which include, for example, computer labs, fitness center, tanning room, and grills. (Rules and Regulations, ¶38 Amenities).

60. In short, the purpose of the contract was to provide dormitory living, with all of the services and amenities advertised

61. This purpose was frustrated when the campus closed, and students were ordered home no longer attending on-campus classes.

## CLASS ALLEGATIONS

62. Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3) as a representative of the following Class:

> All people who paid the costs of room, board, and fees for or on behalf of students residing in Defendant's Florida "campus living" complexes for the Spring 2020 semester who moved out prior to the completion of the semester because of school closures relating to COVID-19.

63. Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or further division into subclasses or limitation to particular issues, as discovery and the orders of this Court warrant.

64. Excluded from the Class are the Defendant, the officers and directors of the Defendant at all relevant times, members of Defendant's immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendant has or had a controlling interest.

65. Plaintiffs are members of the Class they seek to represent.

66. Defendant has thousands of customers that have paid room, board, and fees while school were closed, and students ordered to return home. Accordingly, members of the Class are so numerous that their individual joinder herein is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

67. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to, whether Defendant has refused to offer refunds and whether it has breached its contracts with its customers or otherwise acted unlawfully.

68. The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs were charged rental fees and suffered losses despite their children being ordered to leave campus and return home by school and government officials.

69. Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the Class members Plaintiffs seek to represent, Plaintiffs have retained competent counsel experienced in prosecuting class actions, and Plaintiffs intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

70. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication.

<u>**COUNT I**</u>
**Rescission**

71. Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-70 of this Complaint.

72. Plaintiffs, as well as all other Class members, were in contractual privity with the Defendant as tenants of the Defendant's facilities.  These contractual agreements involving the Class members and Defendant were evidenced in writing and signed by the parties.

73. As noted above, the purpose of the contractual undertaking between the Class members (including Plaintiffs) and Defendant was to provide a "student-only private dormitory" living arrangement to student Class members.  The living space provided by this arrangement was bundled with a number of amenities and conveniences that particularly catered to students attending university campuses, such as a fitness center, organized resident activities through

our Students First Residence Life program," computer labs with free printing, group study lounges, swimming pools, shuttle services to the campus, and university involvement.

74. There has been an equitable breach in this case that warrants rescission because issues of impossibility of performance and frustration of purpose have arisen.

75. As to impossibility of performance, Defendant was obligated to provide the student Plaintiffs and other student Class members with access to common areas, an exercise center, dorm activities, and other services. However, as a result of the COVID-19 pandemic, these common areas and services became both unsafe to provide and unsafe to use.

76. Defendant acknowledged its own impossibility of performance in a post to its website, "We are closing amenities in accordance with the CDC's guidelines for social distancing. We are not providing refunds for any amenity closures at this time." (Campus Advantage, COVID-19 (Coronavirus) Advisory: Resources and Information about the Novel Coronavirus (COVID-19), "Will There Be Refunds Given Due To Amenity Closures?" https://campusadv.com/covid19/)

77. To that end, it should be noted that each living unit had common space shared amongst multiple residents, and in many cases, a shared bathroom. As such, essential daily living and hygiene functions were necessarily performed in a shared common facility with other students that any individual student might not know well, thus presenting a great risk for COVID-19 infection.

78. Indeed, it is noteworthy that very similar dorm facilities run by the universities were closed down and the students urged to leave because the living arrangements were unsafe to occupy. This was consistent with CDC guidelines which discouraged gatherings of more than 10 people and advised that stringent "social distancing" measures be taken to avoid transmission

of COVID-19.  However, Defendant, because of its own selfish pecuniary interests, refused to acknowledge that the particular form of high-density housing arrangement that it provided was inconsistent with prudent safety measures.

79. In addition to that, it was simply not possible for students to fully access common areas and amenities in a prudent manner.  Places such as the pool, group study lounges, game rooms, exercise center, transit shuttles, and computer labs would have required student Class members to group together beyond what was prudent.  Even the heavily-used common hallways presented such a risk.

80. For this reason, it was impossible for the Defendant to provide what was bargained for under the Class members' contracts.

81. As to frustration of purpose, the dorm-style living arrangement was offered as part of a bundled package of amenities that were a fundamental part of Defendant's performance under the contract.  As noted above, Defendant's living facilities and common amenities were rendered unsafe to use as a result of the COVID-19 pandemic.  The provision of these living arrangements along with the coupled amenities were the fundamental purpose of the Class members' agreements and became frustrated by the fact that they could not be safely provided or used.

82. In addition to its facilities being unsafe to use, the Defendant marketed its premises as being in close physical proximity to school and also marketed its services as being advantageous because of a high degree of integration with campus university activities.  Given that the university campuses were closed, and no campus activities were taking place because of the COVID-19 pandemic, this frustrated an essential purpose of the Class members' contracts with Defendant.  Indeed, the very purpose of the Class members' contracts with Defendant

was to allow the student Class members to attend school on university campuses, which was of course not possible due to the closure of the university campuses.

83. Defendant has been provided with ample notice of the Class members' desire for rescission. Indeed, not only did the Plaintiffs provide individual notice, but, as noted above, so many Class members contacted Defendant that it engaged in mass communications with Class members to present its position that no rescission would be permitted.

84. This case is suitable for rescission because the parties can be equitably restored to their original position or, if that result would not be equitable, a balance of equities can otherwise be achieved.

85. This count for rescission is pleaded in the alternative to any claim for legal relief. To the extent no remedy at law is available, rescission is appropriate.

<u>**COUNT II**</u>
**Breach of Contract**

86. Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-70 of this Complaint.

87. Shared living spaces and common areas were specifically contemplated in the Lease Agreements between the parties. (See Lease Agreement, ¶1 Premises).

88. Use of amenities including "pools," "any Computer Lab, Fitness Center, Tanning Room and grills" is also specifically contemplated in the agreement between the parties. (See Rules and Regulations, ¶ 38).

89. The Defendant posted on their website that they would be "closing amenities in accordance with the CDC guidelines for social distancing," however stated that they would "not be providing any refunds for any amenity closures." (Campus Advantage, COVID-19 (Coronavirus) Advisory: Resources and Information about the Novel Coronavirus (COVID-

19),   "Will   There   Be   Refunds   Given   Due   To   Amenity   Closures?"
https://campusadv.com/covid19/)

90. The Defendants have breached the contract because they are unable to safely provide these services and amenities.

## COUNT III
### Breach of Implied Covenant of Good Faith and Fair Dealing

91. Plaintiffs hereby incorporates by reference the allegations contained in paragraphs 1-70 of this Complaint.

92. Plaintiffs bring this claim on their own behalves and on behalf of the proposed Class against Defendant.

93. In performing its leases with Plaintiffs and the Class members, Defendant has breached the implied covenant of good faith and fair dealing by:

   a. Unfairly and in bad faith asserting that remaining in private dormitories is a reasonable option for Plaintiffs and proposed Class members. Dormitories, whether on or off campus, are not designed to safely house students in the event of a pandemic, and, in order to stay safe, a vast majority of the students must move out in order to practice safe social distancing in accordance with CDC recommendations.

   b. Unfairly and in bad faith representing that its properties serve as private dormitories and provide residence life programs to complement students' academics. However, once the schools have closed and the students it purports to serve have been forced to leave, the reality reveals itself that Defendant does not consider its provision of room, board, and services to be tied whatsoever to the schools or to the students' academics, as it has failed to refund unearned payments for room, board, and fees.

16

      c.  Unfairly and in bad faith failing to refund any monies paid by the Plaintiffs and proposed Class that remain unused as a result of the COVID-19 pandemic.

94. As a result of Defendant's breach of the implied covenant of good faith and fair dealing as set forth above, Plaintiffs and the proposed Class members have been damaged.

## COUNT IV
**Unjust Enrichment**

95. Plaintiffs hereby incorporates by reference the allegations contained in paragraphs 1-70 of this Complaint.

96. Plaintiffs bring this on their own behalves and on behalf of the proposed Class against Defendant.

97. Plaintiffs and members of the Class conferred benefits on Defendant by paying room, board, and fees, despite the closing of colleges and universities and attendant recommendations for social distancing and returning home.

98. Defendant has knowledge of such benefits.

99. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' payments.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant is charging its customers full price of a semester's worth of room, board, and fees of which Plaintiffs and Class members cannot reasonably avail themselves.

100. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Class for their unjust enrichment, as ordered by the Court.

## COUNT V
**Conversion**

101. Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-70 of this Complaint.

102. Plaintiffs bring this claim on their own behalves and on behalf of the proposed Class against Defendant.

103. Defendant deprived Plaintiffs and the other members of the Class of the value they paid for themselves (or the students on whose behalf they paid for) of their right to the services and amenities provided in the lease agreement.

104. Plaintiffs and members of the Class had a right to a refund of their room, board, and fees while the schools the dormitories catered to were and remain closed; Defendant intentionally refused issuance of any refund or credit after the schools were closed; Plaintiffs and Class members were harmed through Defendant's unlawful retention of room, board, and fees; Defendant's conduct was a substantial factor in causing Plaintiff and Class members' harm.

105. Plaintiffs and members of the Class are entitled to the return of the prorated, unused amounts paid for room, board, and fees through the end of the semester.

<u>**COUNT VI**</u>
**Money Had and Received**

106. Plaintiffs hereby incorporates by reference the allegations contained in paragraphs 1-70 of this Complaint.

107. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

108. Defendant received money in the form of room, board, and fee payments that was intended to be used for the benefit of Plaintiffs and the Class; however, those fees were not used for the benefit of Plaintiffs and the Class, and Defendant has not given back or refunded the wrongfully obtained money and fees to Plaintiffs and the Class.

## COUNT VII
### Florida Consumer Collection Practices Act

109. Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-70 of this Complaint.

110. Plaintiffs bring this claim on their own behalves and on behalf of the proposed Class against Defendant.

111. At all times relevant to this action Defendant is subject to and must abide by the law of Florida, including Florida Statute § 559.72.

112. Defendant has violated Florida Statute § 559.72(7) by willfully engaging in other conduct which could reasonably be expected to abuse or harass the debtor Plaintiff or any member of her family.

113. Defendant has violated Florida Statute § 559.72(9) by attempting to enforce a debt when Defendant knows that the debt is not legitimate, or to assert the existence of some legal right when Defendant knows that right does not exist.

114. Defendant's actions have directly and proximately resulted in Plaintiffs prior and continuous sustaining of damages as described by Florida Statute §559.77.

### Prayer for Relief

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. For an Order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Class, and Plaintiffs' attorneys as Class Counsel to represent the Class members;

b. For an Order declaring that Defendant's conduct violates the statutes and laws referenced

herein;

c.  For an Order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d.  For statutory, compensatory and punitive damages in amounts to be determined;

e.  For prejudgment interest on all amounts awarded;

f.   For an Order of restitution and all other forms of equitable monetary relief;

g.  For injunctive relief as pleaded or as the Court may deem proper; and

h.  For a declaration that the Housing Contract and agreements between Defendant and Plaintiffs are unenforceable; and

i.  For an Order awarding Plaintiffs and the Class their reasonable attorneys' fees, litigation expenses, and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

*Amanda J. Allen, Esq.*
**Amanda J. Allen, Esquire**
William "Billy" Peerce Howard, Esquire
Heather H. Jones, Esquire
Florida Bar No. 0098228
Florida Bar No. 0103330
Florida Bar No. 0118974
THE CONSUMER PROTECTION FIRM
4030 Henderson Boulevard
Tampa, FL 33629
Telephone: (813) 500-1500
Facsimile: (813) 435-2369
Billy@TheConsumerProtectionFirm.com
Amanda@TheConsumerProtectionFirm.com
Heather@TheConsumerProtectionFirm.com

***Attorneys for Plaintiff***

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 14, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system to all parties of record.

Respectfully submitted,

*/s/ Amanda J. Allen, Esq.*
**Amanda J. Allen, Esquire**
Florida Bar No. 98228
*ff*